AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
2/24/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: JB DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
2/24/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: Valeria Munoz DEPUTY

United States of America

v.

BUDDY FRANCIS DOUGLAS,

Defendant(s)

Case No. 2:21-mj-00931-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 24, 2021 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Michael F. Sier
*Complainant's signature*

Michael F. Sier, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/24/21

*Judge's signature*

City and state: Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Michael F. Sier, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and arrest warrant against BUDDY FRANCIS DOUGLAS ("DOUGLAS") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2. The facts set forth in this affidavit are based upon my training and experience and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

3. I am a Special Agent of the United States Drug Enforcement Administration ("DEA"). I have been employed as a Special Agent with the DEA since September of 2012 and am currently assigned to the Los Angeles Field Division, Sensitive Investigations Unit. I attended approximately four-and-a-half months of training at the DEA Training Academy in Quantico, Virginia starting in May 2012, where I received training in criminal law and procedure, surveillance operations, search warrant and report writing, undercover operations, confidential

source management, money laundering and asset forfeiture, and specialized training concerning crimes in violations of the Controlled Substances Act contained within Title 21 of the United States Code and criminal conspiracies involving the smuggling and distribution of narcotics and dangerous drugs. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of monetary proceeds of narcotics trafficking. I am familiar with the unlawful importation, possession with the intent to distribute, and distribution of controlled substances, as well as the related monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics. I have also received training on, and worked on several investigations involving, narcotics-related money laundering organizations.

## III. SUMMARY OF PROBABLE CAUSE

4. Since December 2019, Santa Monica Police Department ("SMPD"), Special Investigations Unit, has been investigating BUDDY FRANCIS DOUGLAS ("DOUGLAS"), a convicted felon and suspected dealer of large quantities of heroin, methamphetamine, cocaine, and fentanyl in Los Angeles. As part of the investigation, in January 2020, a confidential source working with SMPD—-Confidential Source 1 ("CS 1")--purchased fentanyl from DOUGLAS at an apartment in downtown Los Angeles, which DOUGLAS was using as a place of operations for his drug business. Following that purchase, CS-1 visited DOUGLAS at this

drug house and another drug house controlled by DOUGLAS in Hollywood on multiple occasions. During these visits, CS-1 observed DOUGLAS and his associates dealing in kilogram-quantities of drugs at both locations.

5. In February 2020, local law enforcement executed a state search warrant at the Hollywood drug house. DOUGLAS and several other individuals were arrested during the search. Officers seized approximately 18 pounds of methamphetamine, a kilogram of cocaine, a kilogram of heroin, and a kilogram of fentanyl, in addition to three handguns and $12,000 in cash. The Los Angeles District Attorney's Office ultimately declined to file charges against DOUGLAS or the other individuals.

6. Following the search on the Hollywood drug house, CS-1 continued to communicate with DOUGLAS and learned that DOUGLAS was still selling drugs. DOUGLAS had changed his behavior following the search on the Hollywood drug house, relocating his operations to a new drug house in downtown Los Angeles, located at 560 South Main Street, Apartment 10S, Los Angeles, California 90013 (the "DOWNTOWN APARTMENT"), in an apparent attempt to keep his drug business separate from DOUGLAS's actual residence, located at 625 North 4th Street, Montebello, California 90640 ("DOUGLAS'S RESIDENCE"). CS-1 also learned that DOUGLAS would no longer handle final delivery of drugs, leaving that to one of his associates.

7. On November 17, 2020, at SMPD's direction, CS-1 negotiated the purchase of two ounces of methamphetamine from DOUGLAS for the following day at the DOWNTOWN APARTMENT. The

following day, at the DOWNTOWN APARTMENT, CS-1 met DOUGLAS's associate, GILBERTO SAMUEL CASTRO ("CASTRO"). During their initial encounter, CASTRO pulled a gun on CS-1 and questioned him. But after calling DOUGLAS on the phone and confirming the agreed-upon drug sale, CASTRO calmed down. He then provided CS-1 with two ounces of suspected methamphetamine.

8. Moreover, in addition to the controlled buy, CS-1 and a second confidential source--Confidential Source 2 ("CS-2")--observed drugs at the DOWNTOWN APARTMENT on multiple occasions between October and November 2020. They both also continued to discuss future drug sales with DOUGLAS, including as recently as February 1, 2021.

9. On February 23, 2021, the Honorable Jacqueline Choolijan issued federal search warrants for the DOWNTOWN APARTMENT, DOUGLAS'S RESIDENCE, and two cars belonging to DOUGLAS. See Case Nos. 21-MJ-899, 901, 902, and 903.

10. On February 24, 2021, agents executed the search warrants at the DOWNTOWN APARTMENT, DOUGLAS'S RESIDENCE, and two cars belonging to DOUGLAS. During the search at DOUGLAS'S RESIDENCE, agents found an unloaded .32-caliber, Walther 32 PPK semi-automatic handgun in a purse. Inside the purse and along with the handgun, agents found a fully-loaded magazine with .32 ammunition and a plastic container of .22 caliber ammunition. Agents also found approximately $15,000 in cash in the same room where the gun and ammunition was located. During the search, DOUGLAS's wife and minor son said the gun was DOUGLAS's,

however, DOUGLAS stated that he got the gun for his wife for her protection.

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, my conversations with other law enforcement officers, and my own participation in the investigation, I know the following:

### A. SMPD's Initial Investigation into DOUGLAS, a Seven-Time Convicted Felon

12. In mid-December 2019, an individual in custody offered to provide SMPD with information regarding a local drug dealer in exchange for consideration of the reduction of criminal charges. The individual agreed to cooperate with law enforcement and was subsequently signed up as a confidential source, Confidential Source 1 ("CS-1").[1] CS-1 provided the name and phone number of DOUGLAS, who CS-1 indicated was selling drugs.

13. Law enforcement conducted an investigation into DOUGLAS and determined that DOUGLAS has previously been

[1] CS-1 is currently cooperating with law enforcement in exchange for consideration in criminal charges from a prior arrest for driving under the influence and possession of a controlled substance. CS-1 has a criminal history which includes possession of a controlled substance, carrying a concealed weapon, possession of a controlled substance while armed, felon in possession of a stun gun, and possession of a controlled substance for sale. CS-1 has a positive cooperative history which has led to seizures and arrests, with the exception of CS-1's purchase of a gram of cocaine from CASTRO, at CASTRO's insistence, during the controlled buy. This purchase of a gram of cocaine was not at the direction of law enforcement. According to the CS, the CS purchased the cocaine, at CASTRO's insistence, to avoid suspicion. The CS-1 voluntarily disclosed this purchase to law enforcement, as discussed further below.

convicted of the following felonies punishable by a term of imprisonment exceeding one year:

a. On or about April 24, 1996, second-degree burglary, a violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles County, Case Number LA023043, for which DOUGLAS received a sentence of 180 days in jail;

b. On or about July 30, 1997, receiving stolen property, a violation of California Penal Code Section 496(a), in the Superior Court for the State of California, County of Los Angeles County, Case Number SA029614, for which DOUGLAS received a sentence of two years in prison;

c. On or about May 13, 1999, burglary, a violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles County, Case Number GA039178, for which DOUGLAS received a sentence of two years in prison;

d. On or about October 14, 2004, four counts of second-degree burglary, a violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles County, Case Number GA057781, for which DOUGLAS received a sentence of six years in prison plus eight months consecutive;

e. On or about July 12, 2007, possession of a controlled substance in prison, a violation of California Penal Code Section 4573.6, in the Superior Court for the State of California, County of Los Angeles County, Case Number

XNOMA038552, for which DOUGLAS received a sentence of two years in prison;

f. On or about March 17, 2011, burglary, a violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles County, Case Number ELABA381536, for which DOUGLAS received a sentence of three years in prison; and

g. On or about August 28, 2014, two counts of second-degree burglary, a violation of California Penal Code Section 459, in the Superior Court for the State of California, County of Los Angeles County, Case Number LAVLA077576, for which DOUGLAS received a sentence of four years in jail plus eight months consecutive.

**B. CS-1 Purchases Fentanyl from DOUGLAS in December 2019**

14. On December 31, 2019, at the direction and under the supervision of SMPD, CS-1 made a controlled purchase of approximately one gram of suspected fentanyl from DOUGLAS at one of DOUGLAS's suspected drug houses, located on Flower Street in downtown Los Angeles (the "Downtown Drug House"). While CS-1 was inside the apartment, the CS-1 reported seeing approximately one to two kilograms of drugs, which CS-1 believed to be fentanyl. In addition, CS-1 reported seeing three other individuals inside the apartment picking up drugs at the time.

15. During subsequent communications with DOUGLAS, CS-1 learned that DOUGLAS also had another apartment in Hollywood that DOUGLAS also used as a place to sell drugs, located on Vine Street in Hollywood (the "Hollywood Drug House").

16. During December 2019 and January 2020, CS-1 visited DOUGLAS at both the Downtown and Hollywood Drug Houses on multiple occasions. During these visits, CS-1 repeatedly saw large amounts of drugs-—in quantities ranging from approximately one to five kilograms of what CS-1 believed to fentanyl and methamphetamine--at both locations.[2] CS-1 provided SMPD with photographs of some of the drugs that CS-1 saw inside of both of DOUGLAS's drug houses.

**C. SMPD and LAPD Execute a Search Warrant at the Hollywood Drug House in February 2020**

17. On February 4, 2020, a SMPD detective investigating DOUGLAS received a telephone call from a Los Angeles Police Department High Intensity Drug Trafficking Area ("LAPD HIDTA") team officer. The officer advised SMPD that a LAPD informant had observed firearms in the Hollywood Drug House and that LAPD planned to seek a search warrant on the Hollywood Drug House. The SMPD detective, who had already drafted a search warrant affidavit based on the December 2019 controlled purchase, advised LAPD of SMPD's pending search warrant. The SMPD detective applied for the search warrant later that day. The Honorable Norman Tarle, Superior Court Judge of Los Angeles County Superior Court, signed the search warrant for the Hollywood Drug House later that day.

18. SMPD and LAPD executed the search of the Hollywood Drug House on the night of February 4, 2020. During the search,

[2] With the exception of the controlled purchase on December 31, 2020, law enforcement did not specifically direct CS-1 to visit the two drug houses during this two-month period. CS-1 would, however, share the information he learned with SMPD.

SMPD and LAPD HIDTA taskforce officers located approximately 18 pounds of methamphetamine, a kilogram of cocaine, a kilogram of heroin, a kilogram of fentanyl, along with three handguns inside the common area of the apartment. The search also uncovered approximately $12,000 in U.S. currency.

19. Approximately four individuals, including DOUGLAS, were present at the Hollywood Drug House during the execution of the search. Law enforcement arrested DOUGLAS for possessing drugs with intent to distribute as well as for being a felon in possession of firearms in violation of California law.

20. From what I understand, based on my conversations with law enforcement officers, LAPD presented charges against DOUGLAS and the others to the Los Angeles District Attorney's Office, which the District Attorney's Office declined to prosecute.

**D. Following His Arrest, DOUGLAS Continues to Traffic Drugs at the DOWNTOWN APARTMENT**

21. Several months after DOUGLAS's arrest, CS-1 advised SMPD that DOUGLAS and CS-1 were still in communication.[3] CS-1 relayed to SMPD, in part, that DOUGLAS informed CS-1 that he was no longer operating from his prior drug houses, the Downtown and Hollywood Drug Houses. DOUGLAS told CS-1 that he was still selling drugs and was now operating out of a new downtown location that he acquired to conduct business, located at 560 Main Street, Apartment 10S, Los Angeles, California 90013 (the

[3] After the search of the Hollywood Drug House, investigating SMPD detectives were redeployed on various COVID and civil disturbance issues. During this time, detectives were in contact with the CS-1, but the pandemic prevented further investigatory action on this matter.

"DOWNTOWN APARTMENT"). DOUGLAS explained to CS-1 that he moved drug houses because law enforcement became aware of his drug trafficking at the prior drug houses, as well as the fact that he had been evicted from one of the drug houses. During their conversations, DOUGLAS also informed CS-1 that DOUGLAS would negotiate and discuss drug deals and prices, but final delivery of any purchased drugs would be handled by his business partner, ("Co-conspirator 1"), at the DOWNTOWN APARTMENT.

22. Later on, on October 6, 2020, under SMPD supervision, CS-1 conducted an audio recorded meeting with DOUGLAS in the lobby of the building of the DOWNTOWN APARTMENT. During this recorded conversation, DOUGLAS and CS-1 talked about firearms. They also discussed the price of fentanyl and alprazolam; however, CS-1 did not enter the DOWNTOWN APARTMENT on this occasion.

**E. A Second Confidential Source Sees DOUGLAS with Drugs at the DOWNTOWN APARTMENT**

23. On October 1, 2020, a second SMPD Confidential Source ("CS-2") informed the SMPD that CS-2 previously purchased fentanyl from DOUGLAS several times within the past six months at the DOWNTOWN APARTMENT.[4] These purchases occurred before CS-2 agreed to cooperate with law enforcement. CS-2 further stated that CS-2 had been inside the DOWNTOWN APARTMENT on multiple

[4] CS-2 is currently cooperating for the consideration of dismissal of drug-sale charges. CS-2 has a criminal history which includes grand theft, receiving stolen property, grand theft auto, assault with a deadly weapon, possession of a controlled substance, burglary, robbery, and possession of a controlled substance for sale. CS-2 has a positive cooperative history and has provided information to law enforcement which law enforcement has been able to corroborate independently.

occasions in the prior months, where CS-2 observed kilogram-quantities of drugs divided up into gallon-size Ziploc bags and large plastic containers. CS-2 stated that some of containers were stashed inside a black cabinet in the living room of the DOWNTOWN APARTMENT.

24. After agreeing to cooperate with law enforcement, on October 2, 2020, CS-2 went to the DOWNTOWN APARTMENT to meet with DOUGLAS and Co-conspirator 1. This visit was not at the direction of SMPD; rather, at the time, CS-2 was paying a social visit on DOUGLAS and Co-conspirator 1 in the apparent hopes of getting information to provide SMPD. While inside the DOWNTOWN APARTMENT, Co-conspirator 1 showed CS-2 approximately two kilograms of a substance that Co-conspirator 1 identified as fentanyl. Shortly after, CS-2 reported that DOUGLAS arrived with a gallon-size Ziploc bag filled with a substance that DOUGLAS identified as fentanyl. During this encounter, CS-2 took several pictures of various drugs and paraphernalia which CS-2 later provided to SMPD.

**F. CS-1 Makes a Controlled Buy from DOUGLAS and CASTRO at the DOWNTOWN APARTMENT**

25. On November 17, 2020, at SMPD’s direction, CS-1 called DOUGLAS to arrange the purchase of two ounces of methamphetamine for $350 for the following day. During the call, DOUGLAS agreed to sell CS-1 two ounces of methamphetamine for $350. DOUGLAS directed CS-1 to call his partner, Co-conspirator 1, to make arrangements. CS-1 then contacted Co-

conspirator 1 who told CS-1 to call him the next day to make final arrangements.

26. The following day, November 18, 2020, CS-1 was unable to contact DOUGLAS or Co-conspirator 1. Law enforcement and CS-1, however, continued with their plan to conduct a video-recorded, controlled buy. SMPD met CS-1 and provided CS-1 with $350 to purchase two ounces of methamphetamine. CS-1 was also outfitted with a video recording device which CS-1 wore during the controlled buy. Under the supervision of law enforcement, CS-1 then drove to the DOWNTOWN APARTMENT, where CS-1 knocked on the door of the DOWNTOWN APARTMENT several times.

27. According to CS-1, after CS-1 knocked on the door for several minutes, a man who CS-1 knew as "Chino," and whom law enforcement later determined to be CASTRO, arrived at the front door of the DOWNTOWN APARTMENT and unlocked it.[5] CS-1 told CASTRO that CS-1 was looking for Co-conspirator 1. CASTRO told CS-1 he was not there and to return in 20 minutes. CS-1 left and returned to the DOWNTOWN APARTMENT approximately 20 minutes later. By that time, two other people, a man and a woman, were waiting in the hallway outside the DOWNTOWN APARTMENT. While talking with these people in the hallway, CS-1 learned that they were also looking for Co-conspirator 1 to obtain resupplies of drugs.

---

[5] Although CS-1 knew CASTRO as "Chino," and CS-1 had seen him in passing at DOUGLAS's Downtown Drug House earlier in the year, this was the first time CS-1 had sustained interactions with CASTRO. Following the controlled purchase, CS-1 provided Chino's social media information to law enforcement, which allowed law enforcement to identify him as CASTRO.

28. CS-1 proceeded to knock on the door of the DOWNTOWN APARTMENT. CASTRO answered and let CS-1 inside the apartment. Once inside, they discussed the deal that CS-1 had previously agreed to with DOUGLAS and Co-conspirator 1 the day before, namely the price. While discussing the price, CASTRO questioned CS-1's bona fides and pointed a handgun at CS-1's head. CS-1 then attempted to calm CASTRO down. After calming CASTRO down, CS-1 asked CASTRO to call DOUGLAS to confirm the deal. CASTRO then called DOUGLAS and handed the phone to CS-1, who spoke with DOUGLAS on the phone and reminded him of their agreed-upon deal. CS-1 then handed the phone back to CASTRO, who spoke to DOUGLAS further. DOUGLAS then told CASTRO to sell CS-1 two ounces of methamphetamine. DOUGLAS also told CASTRO to make sure CS-1 picked up a gram of cocaine that CS-1 had previously asked about several months earlier.[6]

29. CASTRO prepared a package with suspected methamphetamine and handed it to CS-1 in exchange for payment. CASTRO then handed CS-1 a small sample of cocaine per DOUGLAS's direction. While inside the apartment, CS-1 observed that there was at least a couple of kilograms of suspected drugs in addition to the handgun that CASTRO previously pointed at CS-1. CS-1 then left the apartment after getting CASTRO's phone number.

30. After leaving the DOWNTOWN APARTMENT, CS-1 met SMPD detectives at a prearranged location. SMPD detectives collected

[6] CS-1 had previously asked DOUGLAS about cocaine to see if was still selling drugs to provide information to SMPD.

approximately 74 grams of suspected methamphetamine, including the packaging weight, which CS-1 had purchased from CASTRO. A DEA laboratory later tested the methamphetamine and determined the amount to be approximately 66.08 grams of actual methamphetamine.

31. When CS-1 met SMPD detectives at the prearranged location, the focus of the brief conversation was primarily how CASTRO pointed a handgun at CS-1 and whether CS-1 was ok. SMPD did not ask any other specific questions about the deal. This, in part, was because SMPD had been monitoring the controlled purchase through a live audio transmitter on CS-1 during the transaction. At the time, however, SMPD was not aware of CS-1's purchase of the small sample of cocaine as CS-1's live audio transmitter briefly cut out during this part of the deal.

32. The following day, before SMPD detectives watched the video of the controlled buy, CS-1 contacted detectives and advised them that CS-1 had also obtained a gram of cocaine in addition to the methamphetamine that SMPD directed CS-1 to purchase. CS-1 told detectives that CS-1 forgot to mention it to SMPD immediately after the controlled purchase because CS-1 was overwhelmed after having had a gun pointed at CS-1. CS-1 explained that CS-1 accepted the gram of cocaine, at CASTRO's and DOUGLAS's insistence, out of fear for his safety, as CASTRO had just pointed a gun at his head, and because CS-1 had to in order to not look suspicious as CS-1 had previously been asking DOUGLAS about cocaine months earlier in the hopes of learning

information for SMPD. CS-1 told SMPD that CS-1 had disposed of the cocaine sample and did not use it.

33. Later that day, SMPD reviewed the surveillance video of the controlled purchase and saw the two ounces of methamphetamine and the gram of cocaine that CS-1 purchased. SMPD detectives also saw CASTRO holding a handgun in the video, however, due to the position of the recording device, detectives could not see if CASTRO pointed the gun at CS-1. SMPD officers did, however, hear CS-1 make statements on the video to the effect of "come on, bro" and "you don't need the gun."

34. SMPD detectives later reviewed DOUGLAS's phone records from November 18, 2020. The records confirm that a call from DOUGLAS's phone number, ending in 4702, called the phone number CASTRO provided to CS-1 as being CASTRO's phone number, ending in 4556, at approximately 5:29 p.m. This timestamp corresponds to the time CS-1 was inside the DOWNTOWN APARTMENT and talking to CASTRO while DOUGLAS was on the phone. During this call, CS-1 is heard talking to DOUGLAS, specifically referring to him by his nickname on the call.

**G. The Confidential Sources Discuss Future Drug Sales with DOUGLAS and CASTRO**

35. Following the controlled purchase, both CS-1 and CS-2 continued to have communications with both CASTRO and DOUGLAS regarding the purchase of additional drugs.

36. For example, on December 4, 2020, CS-1 texted CASTRO inquiring about the price of an ounce of fentanyl. CASTRO responded, "1200."

37. Additionally, on December 9, 2020, CS-2 communicated via a recorded phone call with DOUGLAS. CS-2 asked DOUGLAS if he had any "clear," which based on my training and experience, is slang for methamphetamine, for sale. DOUGLAS responded that he did not have "clear," but could get CS-2 cocaine for $1350 an ounce. DOUGLAS advised that he would have to make some phone calls to get CS-2 "clear." DOUGLAS advised that his "clear guys" would only sell 10 ounces at a time and DOUGLAS could get 10 ounces for $2000 to $2100. DOUGLAS advised that "who I set you up with, can get you everything you ask for." DOUGLAS informed CS-2 that the last time he bought "clear," DOUGLAS purchased 26 ounces and was down to his last four ounces. DOUGLAS further advised that he was purchasing 10 ounces of methamphetamine for significantly less, as most people are paying $2600 to $2900 for the same amount. DOUGLAS told CS-2 that "clear is a good one, it always sells."

38. Moreover, on January 31 and February 1, 2021, CS-2 had additional recorded calls with DOUGLAS where they discussed purchases of methamphetamine. Specifically, during a conversation on January 31, 2021, CS-2 asked DOUGLAS, "What's your price?" DOUGLAS replied, "Well you're looking at about 28 right now," which DOUGLAS indicated was not a bad price. The following day, on February 1, 2021, CS-2 had a follow-up recorded conversation with DOUGLAS. CS-2 indicated he was "ready" to proceed with his purchase. During the call, CS-2 asked about purchasing "clear." DOUGLAS indicated that he would

check on his supplies and he might not be able to get the "clear" for CS-2 until the following morning.

**H. Law Enforcement Executes a Search Warrant on the DOWNTOWN APARTMENT and Douglas's Home and Finds a Gun**

39. On February 23, 2021, the Honorable Jacqueline Choolijan issued federal search warrants for the DOWNTOWN APARTMENT, DOUGLAS'S RESIDENCE, and two cars belonging to DOUGLAS. See Case Nos. 21-MJ-899, 901, 902, and 903.

40. On the morning of February 24, 2021, law enforcement executed the search warrants at the DOWNTOWN APARTMENT and DOUGLAS'S RESIDENCE.

41. During the search of the DOWNTOWN APARTMENT, no one was present. Law enforcement seized gram-level quantities of suspected methamphetamine, cocaine, marijuana, and multiple rounds of different types of ammunition, including .223 caliber, 40mm, 9mm, shotgun shells, and .22 caliber ammunition.

42. During the search of DOUGLAS'S RESIDENCE, DOUGLAS's wife informed agents that there was a gun and ammunition inside a purse in the front bedroom. Law enforcement then located the purse, a Louis Vuitton purse with a handwritten price tag still attached to it, on the bed in the bedroom. DOUGLAS's wife told agents that she had purchased the Louis Vuitton purse, however, the items in it were not hers. Relevant here, law enforcement previously observed DOUGLAS wearing a Louis Vuitton handbag during prior surveillance, but law enforcement had not seen DOUGLAS carrying this particular handbag before.

43. Inside the purse, agents seized an unloaded .32-caliber, Walther 32 PPK semi-automatic handgun, bearing serial number 386557K, a fully-loaded magazine with .32 caliber ammunition separate from the handgun, and a plastic container with multiple rounds of .22 caliber ammunition. During the search, both DOUGLAS's wife and his minor son stated that the gun belonged to DOUGLAS. DOUGLAS, however, denied ownership of the gun. DOUGLAS stated that he got the gun for his wife for her protection. In the same room as the purse were other items appearing to belong to DOUGLAS, including men's clothing, shoes, personal items, and a bag full of paperwork in DOUGLAS's name. A dresser was located near the bed where the purse was located. Underneath the dresser, law enforcement found a clear gallon-sized plastic bag containing what DOUGLAS stated was approximately $15,000 in cash.

**I. Interstate Nexus**

44. On February 24, 2021, I contacted an ATF Interstate Nexus Expert and Special Agent regarding the .32-caliber, Walther 32 PPK semi-automatic handgun found in DOUGLAS'S RESIDENCE. The agent confirmed that the handgun was manufactured outside of the State of California. Because the handgun was found in California, I believe that it has traveled in and affected interstate commerce.

///

///

///

**V. CONCLUSION**

45. For all of the reasons described above, there is probable cause to believe that BUDDY FRANCIS DOUGLAS has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24th day of February, 2021.

THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE